## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
**STORY OF STUFF PROJECT, et al.,** )
)
    **Plaintiffs,** )
)
      **v.** )     **Case No. 17-cv-00098 (APM)**
)
**UNITED STATES FOREST SERVICE,** )
)
    **Defendant.** )
_____ )

## MEMORANDUM OPINION AND ORDER

### I.    INTRODUCTION

Plaintiffs Story of Stuff Project and Courage Campaign Institute (collectively, "Plaintiffs") bring this action against Defendant United States Forest Service (the "Forest Service") pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. Plaintiffs seek records related to the government's management of Nestlé Waters North America, Inc.'s ("NWNA") operations in the San Bernardino National Forest in California.

After Plaintiffs filed this lawsuit, the Forest Service conducted a search and located 928 photos, 728 geographic information system ("GIS") files, 4 spreadsheets, 1 video, and 11,425 pages in responsive records. The Forest Service withheld some of these records in their entirety, redacted some, and released others in full to Plaintiffs. To justify its withholdings and redactions, the Forest Service invoked FOIA Exemptions 4, 5, 6, and 9. In turn, Plaintiffs contest the Forest Service's withholdings and redactions as unjustified.

Before the court are the parties' cross-motions for summary judgment. For the reasons described below, the court finds that the Forest Service properly withheld information under Exemption 5. However, the court also finds that the Forest Service has not properly justified

withholding information under Exemptions 4, 6, or 9. Accordingly, Defendant's Motion for Summary Judgment is granted in part and denied in part and Plaintiffs' Cross-Motion for Summary Judgment is denied.

## II.    BACKGROUND

Plaintiff Story of Stuff Project is a non-profit corporation that facilitates an online community dedicated to environmental sustainability and resource conservation efforts. Compl., ECF No. 1, ¶ 4. Story of Stuff Project has more than 800 members who live near the San Bernardino National Forest and have expressed concern about the diversion of water resources from the Forest. *Id.* Plaintiff Courage Campaign Institute is a non-profit corporation that organized, among other actions, a campaign asking NWNA to cease bottling water in California in response to the historic California drought. *Id.* ¶ 5. Courage Campaign Institute has over 9,000 members who live near the San Bernardino National Forest, regularly visit the Forest, and have expressed concern about the diversion of water resources from the Forest. *Id.*

In light of their mutual concern regarding the government's management of NWNA's operations and use of resources on public lands in the San Bernardino National Forest, Plaintiffs sent a FOIA request to the Forest Service on November 7, 2016, seeking records pertaining to:

> The water diversion and transmission facilities constructed and operated on U.S. Forest Service land in and near the West Fork of Strawberry Creek in the San Bernardino National Forest; and
>
> The "Nestle Waters North America Inc. Special Use Permit CE" listed on the Current Schedule of Proposed Actions (SOPA) 01/01/2016    to    03/31/2016    at    the    URL: http://www.fs.fed.us/sopa/components/reports/sopa-110512-2016-01.html#4.

*See* Def.'s Mot. for Summ. J., ECF No. 19 [hereinafter Def.'s Mot.], Attach. A, ECF No. 19-2, at 1–2.

Plaintiffs filed this lawsuit on January 13, 2017, challenging the government's failure to process its FOIA request and disclose any responsive documents. *See generally* Compl. The Forest Service thereafter began to produce records. The Forest Service located 928 photos, 728 GIS files, 4 spreadsheets, 1 video, and 11,425 pages of responsive records, and released non-exempt, redacted records to Plaintiffs in rolling productions from February 2017 through August 2017. *See* Def.'s Mot., Statement of Material Facts as to Which There Is No Genuine Issue [hereinafter Def.'s Stmt.], ¶¶ 8–9; *see also* Def.'s Mot., Attach. B, ECF No. 19-3. The Forest Service invoked FOIA Exemptions 4, 5, 6, and 9 to withhold or redact some of the responsive records; of the 11,425 pages identified by the Forest Service, 8,193 pages were released in full, 1,991 pages were released in part, and 1,241 were withheld in their entirety. Def.'s Stmt. ¶¶ 10–12.

After production, the Forest Service moved for summary judgment. *See* Def.'s Mot., Mem. of P. & A. in Supp. of Def.'s Mot. [hereinafter Def.'s Mem.]. The motion was supported by the declaration of Latagna Rush, the Region 5 FOIA/PA Coordinator with the Forest Service, *see* Def.'s Mot., Decl. of Latanga Rush, ECF No. 19-1 [hereinafter Rush Decl.], as well as a *Vaughn* Index, *see* Def.'s Mot., Attach. C, ECF No. 19-4 [hereinafter *Vaughn* Index]. Rush's declaration explained the scope of the search conducted in response to Plaintiffs' FOIA request and the reasons for the Forest Service's invocation of various FOIA exemptions to redact and withhold the records. *See generally* Rush Decl.

Plaintiffs opposed the Forest Service's motion, and filed a cross-motion for summary judgment, asserting that no proper basis exists for most of the government's redactions and withholdings. *See* Pls.' Notice of Errata, ECF No. 25, Pls.' Corrected Cross-Mot. for Summ. J. &

Resp. to Def.'s Mot., ECF No. 25-1 [hereinafter Pls.' Cross-Mot.],[1] at 2–4; *see also* Pls.' Reply in Supp. of Pls.' Cross-Mot., ECF No. 26 [hereinafter Pls.' Reply]. In response to Plaintiffs' arguments, the agency conducted a supplemental search and located an additional submission to the agency by NWNA, which the Forest Service reviewed, redacted, and released to Plaintiffs. *See* Def.'s Mem. of P. & A. in Opp'n to Pls.' Cross-Mot. & Reply to Pls.' Opp'n to Def.'s Mot., ECF No. 23 [hereinafter Def.'s Reply], at 1. The Forest Service's subsequent production was accompanied by the supplemental declaration of Latanga Rush and an updated *Vaughn* Index. Def.'s Reply, 2nd Decl. of Latanga Rush, ECF No. 23-2 [hereinafter 2d Rush Decl.], Attach. D, ECF No. 23-3 [hereinafter 2d *Vaughn* Index]. In further support of its motion for summary judgment, the Forest Service also submitted the declaration of Larry Lawrence, the Natural Resource Manager of NWNA. *See* Def.'s Reply, Decl. of Larry Lawrence, ECF No. 23-1 [hereinafter Lawrence Decl.].

The parties' motions are now ripe for disposition.

## III.    STANDARD OF REVIEW

Most FOIA cases are appropriately resolved on motions for summary judgment. *Brayton v. Office of the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011). A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if a reasonable fact-finder could find for the nonmoving party, and a fact is "material" only if it is capable of affecting the outcome of litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

[1] Per the Plaintiffs' request, the court has considered only the arguments contained in the corrected filing of Plaintiffs' Cross-Motion for Summary Judgment and Response to Defendant's Motion for Summary Judgment, ECF No. 25-1, which replaced Plaintiffs' previous filings at ECF Nos. 20 and 21. *See* Pls.' Notice of Errata, ECF No. 25.

A defendant agency in a FOIA case is entitled to summary judgment upon demonstrating that no material facts are in dispute, that it has conducted an "adequate search," and that all located responsive records have been produced to the plaintiff or are exempt from disclosure. *See Students Against Genocide v. Dep't of State*, 257 F.3d 828, 833, 838 (D.C. Cir. 2001). An "adequate search" is one that is "reasonably calculated to uncover all relevant documents." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). The agency bears the burden of proving that it performed such a search, and it may rely on sworn affidavits or declarations to do so. *See SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200–01 (D.C. Cir. 1991). The court may grant summary judgment to the agency based on this evidence if it is reasonably specific and contradicted by neither record evidence nor evidence of agency bad faith. *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981); *accord Beltranena v. Clinton*, 770 F. Supp. 2d 175, 181–82 (D.D.C. 2011). Plaintiffs can rebut an agency's supporting affidavits and declarations by demonstrating, with "specific facts," that there remains a genuine issue as to whether the agency performed an adequate search for documents responsive to the plaintiff's request. *See Span v. U.S. Dep't of Justice*, 696 F. Supp. 2d 113, 119 (D.D.C. 2010) (quoting *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 (1989)).

An agency also bears the burden of showing that it properly withheld materials pursuant to a statutory exemption. *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 746 F.3d 1082, 1088 (D.C. Cir. 2014). An agency "may carry its burden . . . by submitting sufficiently detailed affidavits or declarations, a *Vaughn* index of the withheld documents, or both, to demonstrate that the government has analyzed carefully any material withheld and provided sufficient information as to the applicability of an exemption to enable the adversary system to operate." *Brennan Ctr. for Justice v. Dep't of State*, 296 F. Supp. 3d 73, 80 (D.D.C. 2017). "If

the agency's affidavits provide specific information sufficient to place the documents within the exemption category, if this information is not contradicted in the record, and if there is no evidence in the record of agency bad faith, then summary judgment is appropriate without *in camera* review of the documents.'" *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 626 (D.C. Cir. 2011) (internal quotation marks omitted).

## IV. DISCUSSION

The Forest Service invokes FOIA Exemptions 4, 5, 6, and 9 to justify its various redactions and withholdings. Plaintiff challenges the applicability of all exemptions.[2] *See generally* Pls.' Cross-Mot.; Pls.' Reply. The court addresses the parties' disputes below.

### A. Exemption 4

The Forest Service withheld and redacted information contained in agency memoranda and emails, letters, GIS files, contractor resumes, maps, and research reports pursuant to Exemption 4. *See* Rush Decl. ¶ 7; *see also Vaughn* Index at 1–3, 8–9. This information consists of: "proprietary mapping information describing the location of springs, wells and pathways to those locations; associated infrastructure information; technical specifications of equipment; geological and geophysical information concerning wells and geological and hydrogeological analysis of springs as well as proprietary groundwater production information." Def.'s Mem. at 7 (citing Rush Decl. ¶¶ 9–10). The Forest Service also withheld the text of the report it located in the supplemental search, including attachments, which "consist of [GIS] files, photographs, field inventory forms and summary and analytical reports." 2d Rush Decl. ¶ 9; 2d *Vaughn* Index at 1–3; *see* 2d Rush

---

[2] Plaintiffs' challenges shifted throughout the briefing. At first, Plaintiffs did not challenge the Exemption 6 withholdings, but later did so in their reply brief, asserting that the Forest Service mistakenly labeled certain name withholdings as protected by FOIA Exemption 4. *See* Pls.' Reply at 1–2. Plaintiffs also initially challenged the adequacy of Defendant's search, *see* Pls.' Cross-Mot. at 17–18, but later conceded that the Forest Service conducted an adequate search, *see* Pls.' Reply at 13–14. Thus, the only issues left for the court to resolve are the propriety of the Forest Service's withholdings under the FOIA Exemptions.

Decl., Attach. E, ECF No. 23-3.  The Forest Service characterizes the withheld information as "proprietary commercial information obtained from a third-party private business," NWNA.  Rush Decl. ¶ 8; 2d Rush Decl. ¶ 10.  Accordingly, the Forest Service asserts that it is "withholding this information in order to prevent competitive harm to the business submitter," NWNA.  Rush Decl. ¶¶ 9–10; 2d Rush Decl. ¶¶ 11–12.

Exemption 4 permits an agency to withhold "trade secrets and commercial or financial information obtained from a person and privileged or confidential."  *See* 5 U.S.C. § 552(b)(4).  In a challenge to a withholding where the underlying records are *not* trade secrets, as is the case here, "the agency must establish that the withheld records are (1) commercial or financial, (2) obtained from a person, and (3) privileged or confidential."  *Jordan v. U.S. Dep't of Labor*, 273 F. Supp. 3d 214, 230 (D.D.C. 2017) (internal quotation marks omitted).  In this case, the parties' dispute centers on whether the commercial information obtained from NWNA and withheld by the Forest Service is "confidential."

"The D.C. Circuit has developed two tests to determine whether information is 'confidential' for purposes of Exemption 4."  *Ctr. for Pub. Integrity v. U.S. Dep't of Energy*, 287 F. Supp. 3d 50, 62 (D.D.C. 2018).  "If the agency receives the information by way of mandatory disclosure, the court will apply the test set out in *National Parks Conservation Association v. Morton*, 498 F.2d 765 (D.C. Cir. 1974) ['*Nat'l Parks I*']."  *Ctr. for Pub. Integrity*, 287 F. Supp. 3d at 62.  If disclosure is voluntary, then the court applies the test set out in *Critical Mass Energy Project v. Nuclear Regulatory Commission*, 975 F.2d 871 (D.C. Cir. 1992).  *See Ctr. for Pub. Integrity*, 287 F. Supp. 3d at 62.  Here, the parties agree that the *National Parks* mandatory-disclosure test applies, because NWNA's submission of the withheld commercial information was required as part of its special use permit renewal project.  *See* Rush Decl. ¶ 7; Pls.' Cross-Mot. at

8. Thus, the withheld information at issue here is considered "confidential" for purposes of Exemption 4 if its "disclosure is likely (1) to impair the agency's ability to obtain the information in the future or (2) to cause substantial harm to the competitive position of the source of the information." *Ctr. for Digital Democracy v. FTC*, 189 F. Supp. 3d 151, 159 (D.D.C. 2016) (citing *Nat'l Parks I*, 498 F.2d at 770). Because the Forest Service asserts only that the second prong of the *National Parks* test justifies its withholdings, the court will address only whether disclosure of the withheld information would "cause substantial harm to the competitive position" of NWNA. *See* Def.'s Mem. at 7–8; Def.'s Reply at 8, 10–12.

Plaintiffs' objections to the Forest Service's invocation of Exemption 4 are two-fold. First, Plaintiffs assert that releasing the Exemption 4 redactions would not cause substantial harm to NWNA because the withheld information is already in the public domain. Pls.' Cross-Mot. at 6. Second, Plaintiffs alternatively assert that the Forest Service has not shown that disclosure of the withheld information would actually cause harm to NWNA's competitive position. *Id.* The court addresses these arguments below.

### 1. Whether the Withheld Information Is in the Public Domain

Before analyzing whether the Forest Service's withholdings are properly protected under Exemption 4, the court first addresses the "threshold issue" raised by Plaintiffs as to whether any of the withheld information is in the public domain and therefore must be disclosed over the agency's otherwise valid Exemption 4 claim. *Cf. Protect Democracy Project, Inc. v. U.S. Dep't of Def.*, No. 17-cv-842, 2018 WL 3995884, *4 (D.D.C. Aug. 21, 2018). Pursuant to the public domain doctrine, "information already available to the public cannot cause competitive injury and is not protected from disclosure by Exemption 4." *People for the Ethical Treatment of Animals (PETA) v. U.S. Dep't of Health & Human Servs.*, 901 F.3d 343, 352 (D.C. Cir. 2018); *see also*

*Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16, 19 (D.C. Cir. 1999) ("[I]f identical information is truly public, then enforcement of an exemption cannot fulfill its purposes."). To prevail under this doctrine, the requester "'has the burden of showing that there is a permanent public record of the *exact portions* [it] wishes' to obtain." *PETA*, 901 F.3d at 352 (quoting *Davis v. U.S. Dep't of Justice*, 968 F.2d 1276, 1280 (D.C. Cir. 1992). "The burden of production is allocated in this way because 'were it otherwise, the government would face the daunting task of proving a negative: that requested information had not been previously disclosed.'" *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 963 F. Supp. 2d 6, 12 (D.D.C. 2013) (quoting *Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999)).

Plaintiffs contend that because "[v]ery detailed information about [NWNA's] operations, including bore holes locations, technical specifications of its pipelines, and production amounts" exists in the public domain, the Forest Service cannot invoke Exemption 4 to withhold that information. Pls.' Cross-Mot. at 7. Plaintiffs point to a March 1999 Dames & Moore report entitled "Assessment of History and Nature of Arrowhead Springs, San Bernardino Mountains, San Bernardino County, California"—released by the California State Water Resources Control Board in December 2017—as the source of NWNA's information in the public domain. *See* Pls.' Cross-Mot., Decl. of Miranda Fox [hereinafter Fox Decl.], ECF No. 25-2, Attach. A [hereinafter 1999 Dames & Moore Report][3]; *see also* Lawrence Decl. ¶ 9. The report "document[s] the identity and nature of springs and bore holes at the Arrowhead Springs in Strawberry Canyon, in the San Bernardino Mountains," 1999 Dames & Moore Report at 12, and provides maps and photos of

---

[3] All citations to the 1999 Dames & Moore Report are to the pages electronically generated by CM/ECF.

"the locations of all of the springs and bore holes at this site, along with the roads, the collection pipeline, and the topography in the vicinity of the springs," *id.* at 16; *see also id.* at 17–27.

The declaration of Larry Lawrence establishes that the 1999 Dames & Moore report is largely distinguishable from the withheld information in this case. *See generally* Lawrence Decl. To begin with, Lawrence explains that the 1999 report differs from the withheld records because, unlike the 1999 report, other NWNA records contain "very specific geological and hydrological details about the historical development and construction of NWNA's springs, as well as the source of spring flows," in addition to "historical flow rates, detailed photographs, and NWNA's earlier methods of operation." *Id.* ¶ 10. Moreover, Lawrence notes that the Old Fire of October 2003 in the San Bernardino Mountains "completely destroyed substantially all of NWNA's infrastructure in Strawberry Canyon," including "pipeline, anchors, pressure release valves, and associated equipment." *Id.* ¶ 11. Accordingly, Lawrence asserts that only "materials prepared after October 2003 that describe or locate NWNA's infrastructure will reflect current field conditions." *Id.* As the Forest Service describes it, the effects of the fire were so devastating that NWNA had to completely rebuild its infrastructure in the San Bernardino Mountains, such that the post-2003 site includes "new materials for the infrastructure, [new] specific locations of certain infrastructure within the right-of-way, and [new] methods of affixing the infrastructure to the earth." Def.'s Reply at 9.

Simply put, Lawrence's declaration satisfies the court that much of the information in the 1999 Dames & Moore report is not the same as the information withheld by the Forest Service here pursuant to Exemption 4. In light of Lawrence's unchallenged characterization of the effects of the 2003 fire, *cf.* Pls.' Reply at 8–9, the court credits the Forest Service's assertion that, because

of the 2003 fire, "many of the infrastructure and location descriptions in [the 1999 Dames & Moore Report] are obsolete." Lawrence Decl. ¶ 11.

For their part, Plaintiffs do little more than point the court in the direction of the 1999 report and assert, as a general matter, that it contains information that duplicates the information withheld by the Forest Service. *See* Pls.' Cross-Mot. at 7; Pls.' Reply at 9. This is plainly insufficient to satisfy their burden under the public domain doctrine. *Cf. Cottone*, 193 F.3d at 554–55 (holding that a requester met his burden to establish that information withheld pursuant to a FOIA exemption already was in the public domain by "demonstrat[ing] precisely which recorded conversations [captured via wiretap] were played in open court" and providing a "trial transcript [that] clearly indicate[d] the precise date and time that the particular conversation was recorded and the unique identification number assigned to the tape").

Plaintiffs do, however, advance one counterargument to Lawrence's declaration—that "much of the information [in the 1999 report] such as bore hole locations etc. have not changed" since the 2003 fire—that gives the court pause. *See* Pls.' Reply at 9. As discussed, the court is persuaded that the 2003 fire led NWNA to replace nearly all the above-ground infrastructure in place prior to the fire, *see* Lawrence Decl. ¶ 11, but the Forest Service does not provide any details as to whether the locations of NWNA's boreholes and springs changed as a result of the 2003 fire, *cf. id.* In other words, while the agency's declarations make clear that the 2003 fire affected NWNA's operations *above* ground, the court cannot determine whether the fire affected NWNA's field conditions *below* ground, rendering the information from the 1999 Dames & Moore report as to the locations of NWNA's boreholes and springs likewise obsolete. In light of the agency's failure to clarify that point in its declarations, the court denies the parties' cross-motions for

summary judgment with regard to Exemption 4.[4]  The court will allow the Forest Service an additional opportunity to clarify whether the locations of NWNA's springs and boreholes following the 2003 fire remained the same, and if so, to segregate that publicly-disclosed information from any exempt material, *see generally* 5 U.S.C. § 552(b) ("Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection.").  As to the withheld information that has not been publicly disclosed, however, the court will, for the sake of completeness, continue on to address whether that information is "confidential" within the meaning of Exemption 4.

### 2.    *Whether the Information Is Confidential Under* National Parks

To successfully demonstrate that disclosure of the withheld information will cause substantial harm to the competitive position of NWNA, the Forest Service must show that NWNA "(1) actually face[s] competition, and (2) substantial competitive injury would likely result from disclosure."  *See Niagara Mohawk*, 169 F.3d at 18 (quoting *Nat'l Parks & Conservation Ass'n v. Kleppe*, 547 F.2d 673, 679 (D.C. Cir. 1976) ['*Nat'l Parks II*'].  "A sophisticated economic analysis of the likely effects of disclosure is unnecessary."  *PETA*, 901 F.3d at 350 (cleaned up).  As such, "[w]hile an agency may not rely on conclusory and generalized allegations of harm, it also need not make an affirmative showing of actual competitive harm."  *Ctr. for Pub. Integrity v. U.S. Dep't of Energy*, 234 F. Supp. 3d 65, 76 (D.D.C. 2017).  "[E]vidence revealing actual competition and

---

[4] For these reasons, the court also denies the parties' cross-motions with regard to Exemption 9, which permits agencies to withhold "geological and geophysical information and data, including maps, concerning wells."  5 U.S.C. § 552(b)(9).  As the Forest Service notes, "all of the information the agency withheld under Exemption 9 is also being withheld simultaneously under Exemption 4."  Rush Decl. ¶ 22 n.7.  Assuming without deciding that the withheld information regarding NWNA's boreholes "concern[s] wells" within the meaning of Exemption 9, *compare* Pls.' Cross-Mot. at 15–16 (arguing that "bore holes" are not "wells"), *with* Lawrence Decl. ¶ 22 (asserting that "NWNA's spring water collection facilities at Arrowhead Springs include wells bored into the earth"), the problem remains that the court cannot ascertain whether the withheld information about NWNA's boreholes is different from the 1999 Dames & Moore report because of the 2003 fire.  The court will give the agency another opportunity to address this issue as to Exemption 9.

the likelihood of substantial competitive injury is sufficient to bring commercial information within the realm of confidentiality." *Id.* (quoting *Pub. Citizen Health Research Grp. v. Food & Drug Admin.*, 704 F.2d 1280, 1291 (D.C. Cir. 1983)). Critically, the D.C. Circuit has "emphasize[d]" that competitive harm is "limited to harm flowing from the affirmative use of proprietary information *by competitors*" and "should not be taken to mean simply any injury to competitive position, as might flow from customer or employee disgruntlement or from . . . embarrassing publicity." *Pub. Citizen Health Research Grp.*, 704 F.2d at 1291 n.30 (citation omitted). With these principles in mind, the court moves on to the elements that the Forest Service must establish.

### a. Whether NWNA faces actual competition

Off the bat, the parties dispute whether NWNA "face[s] actual competition." *See Niagara Mohawk*, 169 F.3d at 19 (emphasis omitted). In the view of Plaintiffs' declarant, Miranda Fox, the Campaigns Manager of Story of Stuff Project, NWNA does not face "actual competition" as it relates to its operations in the San Bernardino National Forest because "there is no opportunity for another company to come into this area and access the water, or otherwise compete, since [NWNA's] right to the water it withdraws is based upon asserted water rights which it alleges it holds to the exclusion of all others." Fox Decl. ¶ 6. According to Fox, "no other commercial spring or other water developments [exist] near the project site" and "[t]he only application in decades to San Bernardino County for this type of use was . . . about 15 miles away and it was dropped due to agency and public opposition." *Id.* NWNA's Natural Resource Manager, Larry Lawrence, on the other hand, explains that "[t]he spring water bottling industry is a competitive industry with relatively narrow profit margins" and that "NWNA has numerous competitors, including large, nationally-recognized spring water bottling companies, as well as smaller regional

or specialty spring water bottling companies." Lawrence Decl. ¶¶ 7, 14. As Lawrence avers, "[m]any of NWNA's larger competitors are household names," rendering an exhaustive list unnecessary. *Id.* ¶ 14.

Plaintiffs frame the "actual competition" that NWNA faces too narrowly. The inquiry here is not whether disclosure of the withheld information will cause competitive harm to NWNA solely as to its ability to obtain a special use permit to draw water from the San Bernardino National Forest, but instead whether disclosure will cause competitive harm to NWNA as to "day-to-day competition" with other businesses offering bottled spring water. *Cf. Nat'l Parks II*, 547 F.2d at 681–82 (distinguishing between the competitive harm faced by concessioners as a result of disclosure of withheld financial records as to "their day-to-day business operations" and as to "renewal of their contracts").

For this reason, the case of *National Parks II* is distinguishable from the instant matter. There, the D.C. Circuit rejected the National Park Service's assertion that the disclosure of private park concessioners' financial records—including annual balance sheets, yearly descriptions of all projects existing or planned for the following year, and descriptions of every type of concession facility—would cause them competitive harm "at the time for renewal of their [concession] contracts." 547 F.2d at 678, 681. Because renewal of the park concessioners' contracts with the Park Service "tend[ed] to be automatic" pursuant to a statutory renewal preference, the court concluded that there were too many "practical barriers to competition by potential contract bidders" to conclude that the concessioners faced "actual" competition in renewing their concession contract. *See id.* at 681–82. By contrast, here, the NWNA asserts that the injury it will incur from disclosure will be to its competitive position in the spring water bottling industry as a whole, not just to its business operations in the San Bernardino National Forest. *See generally*

Lawrence Decl. Thus, although Plaintiffs may well be correct that NWNA faces no competition when it comes to obtaining a use permit to access spring waters in the San Bernardino National Forest, the court concludes that Lawrence's assertion—uncontroverted by Plaintiffs—that NWNA faces "actual competition" in the spring water bottling industry as a whole satisfies the agency's burden as to this element. *See* Lawrence Decl. ¶¶ 7, 14; *cf. Niagara Mohawk*, 169 F.3d at 18–19 (finding grant of summary judgment inappropriate where requester "flatly dispute[d]" the agency's assertion that private cogeneration plants faced "actual competition," thus creating a genuine issue of material fact as to the likelihood of substantial competitive harm from disclosure (emphasis omitted)).

          b.       Whether substantial competitive injury will likely result from disclosure

Moving on to the second element, Lawrence's declaration explains that NWNA "invested substantial time, money, and effort" to generate the information withheld by the Forest Service— including "proprietary hydrogeological reports and associated consultant reports" regarding the "location and nature of NWNA's spring sites and infrastructure"—in order to "(i) conduct[] confidential, proprietary evaluation of and due diligence on spring resources; (ii) develop[] an analytic approach to understanding spring sites; (iii) develop[] a unique format for presenting materials to decision makers; (iv) construct[] NWNA's spring water collection infrastructure; and/or (v) install[] specific equipment related to NWNA's spring water collection infrastructure." Lawrence Decl. ¶¶ 6, 12. Accordingly, Lawrence asserts that disclosing the withheld information would cause harm to NWNA's competitive position in four ways. *See id.* ¶¶ 15–19. First, Lawrence maintains that "NWNA's competitors could use the [withheld information] to reverse-engineer NWNA's internal business processes—a unique system that NWNA uses to scientifically evaluate, license, and operationalize spring sites—in order to use these same internal processes to

develop their own spring sources and spring water business." *Id.* ¶ 16.  Second, Lawrence posits that "NWNA's competitors could use the equipment and infrastructure specifications that NWNA has developed at great expense, for the design, construction, and/or installation of their own infrastructure and equipment" at a "significantly lower cost." *Id.* ¶ 17.  Third, Lawrence asserts that "NWNA's competitors could use [the withheld] information . . . to gain a competitive advantage by using that information to draw comparisons designed to favor those competitors in the marketplace." *Id.* ¶ 18.  And, finally, according to Lawrence, "NWNA's competitors could use the formats and forms that NWNA has developed at great expense, for the evaluation, due diligence, construction, and/or installation of their own resources and infrastructure." *Id.* ¶ 19. Together, these statements persuade the court that "[d]isclosing this information would provide [NWNA's] competitors with something of a free roadmap to the industry" and allow NWNA's competitors to gain an unfair competitive advantage based on NWNA's significant investments in time and resources to develop internal business processes, equipment, and infrastructure.  *See PETA*, 901 F.3d at 354 (agreeing with the agency that disclosing the airline carriers and transport routes used by private importers would provide an unfair "windfall" to competitors who could thereby "enter the market without the startup costs associated with researching successful importation means and practices").

Beyond reiterating their public domain argument and re-asserting that NWNA does not face "actual competition," Plaintiffs offer no response to Lawrence's detailed allegations of substantial competitive harm.  *See* Pls.' Cross-Mot. at 6–12; Pls.' Reply at 8–10.  Accordingly, because the Forest Service's explanation is sufficiently detailed to establish a likelihood of substantial competitive harm to NWNA caused by disclosure of the withheld information, the court

concludes that the non-disclosed withheld information is "confidential" within the meaning of Exemption 4.

### B.      Exemption 5

The Forest Service invokes Exemption 5 to withhold portions of information contained in "interagency memoranda and emails from members of the [Forest Service's] interdisciplinary team assigned to analyze for the NWNA's Special Use Permit Renewal Project," as well as "emails, memoranda, and briefing documents prepared by and shared with [the Forest Service] in developing and implementing litigation strategies related to active litigation." Rush Decl. ¶ 11; *see* 2d *Vaughn* Index at 4–8, 10–11. Exemption 5 allows an agency to withhold from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Under this exemption, an agency can refuse to produce responsive records covered by a recognized evidentiary or discovery privilege. *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 847 F.3d 735, 738–39 (D.C. Cir. 2017). "Exemption 5 incorporates the privileges that the Government may claim when litigating against a private party, including the governmental attorney-client and attorney work product privileges, the presidential communications privilege, the state secrets privilege, and the deliberative process privilege." *Abtew v. U.S. Dep't of Homeland Sec.*, 808 F.3d 895, 898 (D.C. Cir. 2015).

Here, the Forest Service invokes the deliberative process privilege and attorney-client privilege to protect from disclosure information contained within the agency's records. *See generally* 2d *Vaughn* Index at 4–8, 10–11; Rush Decl. ¶¶ 13–16; 2d Rush Decl. ¶¶ 13–16. Plaintiffs do not challenge all the redactions made under Exemption 5; instead, Plaintiffs identify specific objections to a "limited set" they believe "do not meet the standards of Exemption 5" and

concede the rest of the Forest Service's withholdings under Exemption 5.  *See* Pls.' Cross-Mot. at 12 n.7.  The court begins by addressing Plaintiffs' challenges to the withholdings made pursuant to the deliberative process privilege and then considers Plaintiffs' challenges as to the information withheld under the attorney-client privilege.

### 1.  *Deliberative Process Privilege*

The Forest Service relies on the deliberative process privilege to withhold interagency memoranda, emails, and draft briefing documents sent between members of the Forest Service interdisciplinary team assigned to analyze the NWNA's Special Use Permit Renewal Project and also to the project decision-maker, the Forest Supervisor.  Rush Decl. ¶¶ 13–16.  The withheld information "reflects the internal comments and discussions between members of the Forest Service interdisciplinary team assigned to that project and predate a final Agency decision on the special use permit renewal project."  Def.'s Mem. at 10.  According to the Forest Service, disclosure of this information would cause the following harms to its deliberative process: "reveal[ing] ongoing policy discussions prior to final decision by the agency[,] [thereby] harm[ing] the decision making process and negatively impact[ing] related current litigation," Def.'s Stmt. ¶¶ 34, 39; and "reveal[ing] the strategy, thought processes, communications, and interactions between attorney and client that assist the attorney in developing and implementing litigation strategy," *id.* ¶¶ 44, 49.

The deliberative process privilege allows an agency to withhold responsive records if the documents "reflect[] advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated."  *See NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975) (internal quotation marks omitted).  The privilege "rests most fundamentally on the belief that were agencies forced to 'operate in a fishbowl,' the frank

exchange of ideas and opinions would cease and the quality of administrative decisions would necessarily suffer." *Army Times Publ'g Co. v. Dep't of Air Force*, 998 F.2d 1067, 1070 (D.C. Cir. 1993) (internal quotation marks omitted).  The privilege only applies, however, to records that are both "predecisional" and "deliberative."  *Mapother v. Dep't of Justice*, 3 F.3d 1533, 1537 (D.C. Cir. 1993); *accord Judicial Watch*, 847 F.3d at 739.  As used in Exemption 5, "predecisional" material is material that is "generated before the adoption of agency policy."  *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).  Material is "deliberative" if it "reflects the give-and-take of the consultative process."  *Id.*

Plaintiffs' challenges to the Forest Service's invocation of the deliberative process privilege are limited to the following assertions: (1) the Forest Service impermissibly withheld factual information that is neither "predecisional" nor "deliberative," *see* Pls.' Cross-Mot. at 12–14, including factual scientific information in letters regarding biological surveys, *see id.* at 14 (citing Bates 001317–19); and (2) the Forest Service failed as a general matter to establish that certain blocks of redacted material contain predecisional or deliberative material, and likely withheld information related to past permit discussions, *id.* (citing Bates 001165); Pls.' Reply at 7 (citing Bates 001120–21, 001131, 001149, 001165, 001173, 001175, 001324, 001348, and 001351).  The court rejects these arguments.  The agency's declarations establish with sufficient particularity that the withheld information is both "predecisional" and "deliberative," and further that any factual information withheld is "inextricably intertwined with the deliberative sections of documents."  *Ctr. for Biological Diversity v. EPA*, 279 F. Supp. 3d 121, 147 (D.D.C. 2017) (quoting *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997)).

To begin with, Plaintiffs' blanket assertion that some of the withheld information may include discussions about prior permits awarded to NWNA, and therefore is not "predecisional,"

lacks substantiation. The agency's declarant avers that the information withheld pursuant to Exemption 5 concerns only the "ongoing permit process that was the subject of the FOIA request" sent by Plaintiffs. Def.'s Reply at 14 (citing 2d Rush Decl. ¶ 15); *accord* 2d Rush Decl. ¶ 15 ("All of the information withheld under Exemption 5 relates to the ongoing permit review process."); *see also Coastal States*, 617 F.2d at 866 (explaining that information is "predecisional" if it is "generated before the adoption of an agency policy"). Plaintiffs offer nothing more than mere speculation to the contrary. Moreover, the withheld information also qualifies as "deliberative" because, as the agency's declarant repeatedly explains, the discussions capture instances when "members of the interdisciplinary team are soliciting ideas from one another about how to proceed with a certain project." 2d Rush Decl. ¶ 15; *accord id.* ¶ 14.

Notwithstanding the fulsome explanation for invoking Exemption 5 provided by the agency in its declarations, Plaintiffs assert that one redaction in particular merits a closer look. Under the subject header "Stream Recon and Proposed Future Surveys," portions of Bates 001317–19 are redacted, according to the Forest Service, because they involve "an ongoing discussion between members of the Forest Service interdisciplinary team assigned to analyze [NWNA's] Special Use Permit Renewal Project about proposals for how to best collect data on related waterways." 2d Rush Decl. ¶ 14. According to Plaintiffs, this information cannot qualify for the deliberative process privilege because the discussion does not reflect "legal or policy matters" and therefore would not "actually inhibit candor in the decision-making process." *See* Pls.' Reply at 6 (internal quotation marks omitted). In support of its argument that the agency's deliberations pertaining to data collection "has nothing to do with 'legal or policy matters,'" *id.*, Plaintiffs cite to *Center for Biological Diversity*, 279 F. Supp. 3d 121. In that case, the EPA withheld as deliberative documents regarding its determination as to whether an action would have

"no effect" on an endangered species, asserting that the documents were "part of an iterative process, one that requires the Agency to weigh and evaluate scientific data, studies, reports and other relevant information in order to reach a determination." *Ctr. for Biological Diversity*, 279 F. Supp. 3d at 147–48 (internal quotation marks omitted). In agreeing with the requester that the information was not deliberative, the court found dispositive the fact that "the 'no effect' determination is statutorily required to be based on 'the best scientific and commercial data available,'" *id.* at 148 (quoting 16 U.S.C. § 1536(a)(2)), thus leaving little room for the agency to exercise the "policy-oriented judgment" with which the deliberative process privilege is principally concerned," *id.* at 150 (internal quotation mark and emphasis omitted).

Plaintiffs' reliance on *Center for Biological Diversity* is misplaced. There, the agency lacked the ability to exercise discretion as to what factors or data would lead to a "no effect" determination. By contrast, here, absent a statutory mandate, the Forest Service *is* exercising "discretion on some policy matter" in its discussions about the best method for collecting data on related waterways. *Id.* at 150 (emphases omitted); *see* 2d Rush Decl. ¶ 14. Stated differently, the Forest Service's discussions pertaining to data collection reflect deliberative "policy judgments" because the Forest Service is engaged in a "back and forth" as to the best method of accomplishing a particular agency objective. Thus, the redacted information is properly withheld under Exemption 5.

### 2. *Attorney-Client Privilege*

The Forest Service relies on the attorney-client privilege to withhold communications between Forest Service staff and government attorneys discussing active or anticipated litigation, "specifically an appeal of the decision issued in Center for Biological Diversity et al. v. U.S. Forest Service et al., case number 5:15-cv-02098, in the U.S. District Court for the Central District of

California." Rush Decl. ¶¶ 15–16. As discussed, Exemption 5 prevents the mandatory disclosure of inter-agency documents that are protected by the attorney-client privilege. *See Nat'l Ass'n of Crim. Def. Lawyers v. U.S. Dep't of Justice Exec. Office for U.S. Attorneys*, 844 F.3d 246, 249 (D.C. Cir. 2016). "In the FOIA context, the agency is the 'client' and the agency's lawyers are the 'attorneys' for the purposes of attorney-client privilege." *Judicial Watch v. U.S. Dep't of Treasury*, 802 F. Supp. 2d 185, 200 (D.D.C. 2011); *see Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 252–54 (D.C. Cir. 1977). A communication is protected by the privilege if its primary purpose is "(i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding." *In re Grand Jury*, 475 F.3d 1299, 1304 (D.C. Cir. 2007) (internal quotation marks omitted).

Of the information withheld by the Forest Service pursuant to the attorney-client privilege, *see generally* 2d *Vaughn* Index at 8, 10–11, Plaintiffs challenge only two withholdings, asserting that neither withheld communication "indicates . . . attorney-client communication." Pls.' Cross-Mot. at 14 (citing Bates 001143 and 001150). Specifically, Plaintiffs emphasize that the email message at Bates 001143 was sent from a Forest Supervisor to a Natural Resource Planner and the email message at Bates 00150 was sent from a Forest Hydrologist to numerous Forest Service employees, *id.*, suggesting that the communications do not "concern a legal matter for which the client sought professional advice," *id.* at 15 (quoting *Judicial Watch v. Dep't of Army*, 435 F. Supp. 2d 81, 89 (D.D.C. 2006)). In light of the agency's declarations explaining the substance of these communications, Plaintiffs' argument is unavailing.

It is well established that although the attorney-client privilege "principally applies to facts divulged by a client to his attorney, this privilege also encompasses any opinions given by an attorney to his client based on, and thus reflecting, those facts as well as communications between

22

attorneys that reflect client-supplied information." *Elec. Privacy Info. Ctr. v. Dep't of Homeland Sec.*, 384 F. Supp. 2d 100, 114 (D.D.C. 2005) (citing *Coastal States,* 617 F.2d at 863). Here, Rush explains that the email communications challenged by Plaintiffs "contain discussion between members of the Forest Service interdisciplinary team where the author of the email is relating confidential, solicited advice from USDA Office of General Counsel (OGC)." 2d Rush Decl. ¶ 16. In other words, the emails in question relay among agency employees confidential advice supplied by the agency's lawyer. The emails are therefore properly protected by the attorney-client privilege.

In light of the foregoing, the court grants summary judgment in favor of the Forest Service as to Exemption 5.

## C.      Exemption 6

Plaintiffs' final challenge is to the Forest Service's withholding of names of individuals who authored scientific reports or worked on biological surveys pursuant to Exemption 6. Pls.' Reply at 2–5; *see* 2d *Vaughn* Index at 3–4; 2d Rush Decl. ¶ 8. The Forest Service redacted this information on the ground that the individuals' privacy interest in having their names protected from disclosure outweighs the minimal public interest in the information. 2d *Vaughn* Index at 3– 4. For their part, Plaintiffs assert that disclosure of the names withheld would not implicate a substantial privacy interest and, in any event, any such interest would be outweighed by the public's interest in learning the names to "judge the qualifications of those who prepared the reports and thus their veracity, since [NWNA] provided [the reports] to public agencies" to support its use of public resources. Pls.' Reply at 4–5.

Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). When

evaluating an agency's invocation of Exemption 6, courts must determine first "whether the [requested records] are personnel, medical or 'similar' files." *See Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1228 (D.C. Cir. 2008). Here, Plaintiffs concede that the withheld information is contained in "similar files" within the meaning of Exemption 6. *See* Pls.' Reply at 3. Accordingly, the court proceeds to the prescribed two-step inquiry. *See Multi Ag Media*, 515 F.3d at 1228. First, the court asks "whether disclosure of the files would compromise a substantial, as opposed to *de minimis*, privacy interest." *Id.* at 1229 (internal quotation marks omitted). The agency may satisfy its burden of showing a substantial invasion of privacy by affidavits containing "reasonable specificity of detail rather than merely conclusory statements." *Prison Legal News v. Samuels*, 787 F.3d 1142, 1147 (D.C. Cir. 2015) (quoting *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013)). "[I]f no significant privacy interest is implicated . . . FOIA demands disclosure." *Multi Ag Media*, 515 F.3d at 1229. If a substantial privacy interest exists, however, the court then "applies a balancing test that weighs the privacy interest in withholding the record against the public's interest in the record's disclosure." *Judicial Watch, Inc. v. Dep't of Navy*, 25 F. Supp. 3d 131, 138 (D.D.C. 2014). The requesting party bears the burden of establishing a valid public interest in the information. *Smith v. Dep't of Labor*, 798 F. Supp. 2d 274, 285 (D.D.C. 2011); *see Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 879 (D.C. Cir. 1989).

Upon review of the Forest Service's declarations, the court cannot accept its conclusory assertions that disclosure of the withheld names would compromise a substantial privacy interest. According to the Forest Service, "[t]he individuals who are mentioned in the responsive records are private individuals who are employed by a private business and government employees." Rush Decl. ¶ 19. The Forest Service asserts that these individuals—"including [the] government

employees"—have a "legitimate privacy interest[] in guarding information about themselves from public dissemination." *Id.* Rather than provide detailed information about *why* disclosing the withheld names would constitute an invasion of privacy, the Forest Service merely concludes that these individuals have a privacy interest in the nondisclosure of their names. Such a conclusory assertion is clearly insufficient to satisfy an agency's burden to invoke Exemption 6. *See Prison Legal News v. Lappin*, 780 F. Supp. 2d 29, 41 (D.D.C. 2011) (holding that agency's conclusory assertion that Exemption 6 applied to withhold "all personal psychiatric/medical information" was merely a "good start" that failed to adequately "describe the documents and the justifications for nondisclosure with reasonably specific detail" (cleaned up)). The Forest Service's explanation is deficient in another respect: by seeming to suggest that the private individuals identified in the records have the same privacy interests as the government employees, the Forest Service impermissibly "lump[s]" the privacy interests of two disparate categories of individual. *Prison Legal News*, 787 F.3d at 1149. Depending on context, a government employee and a private employee may have varying degrees of privacy interests in the non-disclosure of their names. An agency affidavit with sufficient "reasonable specificity of detail" to invoke Exemption 6 would address as to each group how disclosure of their names would constitute an invasion of privacy. *Cf. Climate Investigations Ctr. v. United States Dep't of Energy*, No. 16-cv-00124, 2018 WL 4500884, at *16 (D.D.C. Sept. 19, 2018) ("A categorical approach can be appropriate. But Defendant must explain the privacy interests at stake as to each appropriately categorized group of individuals whose names and identifying information it has withheld.").

In light of the agency's unsatisfactory explanation, the court denies summary judgment to the Forest Service as to Exemption 6. The court, however, also denies summary judgment to Plaintiffs, because Plaintiffs' Exemption 6 argument arose for the first time in their reply brief,

thereby denying the Forest Service the opportunity to respond to those arguments and to cure any shortcomings in its affidavits. *See Ctr. for Digital Democracy*, 189 F. Supp. 3d at 163; *cf.* Pls.' Reply at 1 (explaining that Plaintiffs would not oppose the Forest Service's filing of a surreply limited to the issue of Exemption 6 "because of the confusion surrounding" the withholdings). The court therefore will grant the Forest Service an additional opportunity to address why the withheld names warrant protection under Exemption 6.

## V. CONCLUSION AND ORDER

For the reasons set forth above, Defendant's Motion for Summary Judgment, ECF No. 19, is granted in part and denied in part and Plaintiffs' Cross-Motion for Summary Judgment, ECF No. 25, is denied, as follows:

1. The parties' cross-motions are denied as to Exemptions 4 and 9.

2. Defendant's motion is granted as to its withholdings under Exemption 5 pursuant to the deliberative process privilege and the attorney-client privilege.

3. The parties' cross-motions are denied as to Exemption 6.

The parties shall meet and confer and, no later than October 10, 2018, propose a schedule for an additional round of summary judgment briefing.

Dated:  September 27, 2018

Amit P. Mehta
United States District Judge